1 | REES F. MORGAN (State Bar No. 229899)
ANDREW SCHALKWYK (State Bar No. 287170)
2 | COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
3 | San Francisco, California 94104-5500
Telephone:  415.391.4800
4 | Facsimile:  415.989.1663
Email:    ef-rfm@cpdb.com
5 |        ef-aps@cpdb.com

6 | Attorneys for Plaintiffs
RISING TIDE I, LLC; RISING TIDE II, LLC
7 |

8 |

9 |

10 |

11 |

*(left margin, vertical text)* COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RISING TIDE I, LLC; RISING TIDE II, LLC, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| MICHAEL FITZSIMMONS; PETER LAI; CHRIS G. POWER; PETER J. GOETTNER; CHRISTIAN BORCHER; ERNEST D. DEL; MARC S. YI; JAMES C. PETERS; SOUHEIL S. BADRAN; AND DAVID COWAN, | |
| Defendants. | |

Plaintiffs Rising Tide I, LLC; and Rising Tide II, LLC, (collectively "Rising Tide" or "Plaintiffs") by and through their undersigned attorneys, for their complaint against defendants Michael Fitzsimmons, Peter Lai, Chris G. Power, Peter J. Goettner, Christian Borcher, Ernest D. Del, Marc S. Yi, James C. Peters, Souheil S. Badran, and David Cowan (collectively "Defendants") allege as follows:

## INTRODUCTION

1.     Plaintiffs purchased or otherwise acquired securities in Delivery Agent, Inc. ("Delivery Agent" or the "Company") as a result of material misrepresentations and/or omissions

made by Defendants, including as directors and/or officers of Delivery Agent.  This civil action is brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b), the "Exchange Act") and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).  Plaintiffs also assert claims for fraud and negligent misrepresentation.

2.      Delivery Agent is in the television-commerce space, known as "t-commerce." Delivery Agent claimed that it had developed proprietary technology to connect television viewers to the products they see on TV and the companies that offer those products.  Delivery Agent claimed that, using this proprietary technology, viewers could immediately purchase from their "smart televisions" products they saw on television, or interact further with various companies by accessing special features, using the television's remote control or other smart device.

3.      From at least March 2014 through and including March 2016, Delivery Agent issued and sold securities to investors, including Plaintiffs, in the form of preferred stock, stock warrants, and convertible promissory notes, all with the represented goal of covering the Company's short term negative cash flow ("burn rate") until it had achieved both positive cash flow from operations and an Initial Public Offering ("IPO").  Defendants consistently and repeatedly represented that the IPO was "imminent."

4.      At all times relevant, Delivery Agent claimed through its officers and/or directors that Delivery Agent's technology worked, that it had been proven to be accepted by and used in market tests, and was proprietary.  Relying on those representations, Plaintiffs purchased approximately $17 million in securities from Delivery Agent from September 2014 through and including March 2016.

5.      In actuality, Defendants were aware of, and misrepresented and/or concealed, highly damaging information about the proprietary nature of Delivery Agent's core technology, the functionality of its products, the success of important market tests, the trustworthiness of its most senior executives, and events that made a successful IPO impossible.  Specifically:

a.      Delivery Agent's officers and directors failed to timely disclose to Plaintiffs that a high profile demonstration of its technology in a television commercial during the February 2014 Super Bowl was a complete failure because viewers were unable to use Delivery Agent's technology to purchase products featured in the commercial from their TVs;

b. Compounding this failure, Delivery Agent's officers and directors also did not timely disclose that Defendant Michael Fitzsimmons ("Fitzsimmons"), Delivery Agent's CEO, had directed Delivery Agent officers and others to purchase the products in the Super Bowl commercial once it became clear that the test run of the Company's technology had failed, and subsequently disseminated false and fabricated sales reports claiming that consumers had purchased the merchandise and that the Super Bowl advertising campaign was a success, when it was actually an abject failure;

c. Defendants failed to timely disclose that, as a result of the Super Bowl advertisement fraud perpetrated by Fitzsimmons and others, Delivery Agent's then-auditor (the "Auditor") informed Delivery Agent that it could no longer rely on the representations of certain senior officers in its audits of the company's books, which led Delivery Agent to fire the Auditor and all but ensure that Delivery Agent could never complete an IPO and become a publicly traded company;

d. Defendants affirmatively misrepresented the rationale for replacing the Auditor, stating falsely that the auditor change resulted from a disagreement over revenue recognition, and continued to claim that an IPO was imminent even after going public became a practical impossibility; and

e. Defendants represented that Delivery Agent's technology functioned successfully and was proprietary, claims that were false and/or misleading.

6. In furtherance of its fraudulent scheme, Delivery Agent's officers and directors continued raising cash through securities offerings even though Delivery Agent's officers and directors knew that the Super Bowl advertisement failure and subsequent corporate cover-up were material to a reasonable investor's decision-making and all but ensured that Delivery Agent could never sell stock to the public in an IPO.

7. As a result of the events surrounding the 2014 Super Bowl test-run failure and cover-up, and the omissions and/or false and misleading statements made by Delivery Agent's officers and/or directors, Delivery Agent never went public. Without a public offering and without functioning, proprietary technology, Delivery Agent was unable to attract a buyer or raise more cash, leading Delivery Agent to file for Chapter 11 bankruptcy protection in September 2016.

8. As a result, Plaintiffs' securities are now worthless.

**THE PARTIES**

9. Rising Tide I, LLC ("RTI") is a Delaware limited liability corporation which purchased securities from Delivery Agent.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

10.     Rising Tide II, LLC ("RTII") is a Delaware limited liability corporation which purchased securities from Delivery Agent.

11.     Defendant Fitzsimmons was at all times relevant Delivery Agent's Chief Executive Officer and a member of Delivery Agent's Board of Directors. Plaintiffs are informed and believe, and on that basis allege, that Fitzsimmons was at all times relevant a resident of California.

12.     Defendant Peter Lai ("Lai") was at all times relevant Delivery Agent's President and Chief Operating Officer until approximately January 2015 and thereafter was Delivery Agent's President of Ecommerce.  Plaintiffs are informed and believe, and on that basis allege, that Lai was at all times relevant a resident of California.

13.     Defendant Chris G. Power ("Power") was at all times relevant a member of Delivery Agent's Board of Directors and the Chairman of the Audit Committee.  Plaintiffs are informed and believe, and on that basis allege, that Power was at all times relevant a resident of Colorado.

14.     Defendant Peter J. Goettner ("Goettner") was at all times relevant a member of Delivery Agent's Board of Directors, a member of the Audit Committee, and a member of the Nominating and Governance Committee.  Plaintiffs are informed and believe, and on that basis allege, that Goettner was at all times relevant a resident of California.

15.     Defendant Christian Borcher ("Borcher") was at all times relevant a member of Delivery Agent's Board of Directors, a member of the Audit Committee, and Chairman of the Nominating and Governance Committee.  Plaintiffs are informed and believe, and on that basis allege, that Borcher was at all times relevant a resident of California.

16.     Defendant Ernest D. Del ("Del") was at all times relevant a member of Delivery Agent's Board of Directors.  Plaintiffs are informed and believe, and on that basis allege, that Del was at all times relevant a resident of California.

17.     Defendant Marc S. Yi ("Yi") was at all times relevant a member of Delivery Agent's Board of Directors and a member of the Nominating and Governance Committee. Plaintiffs are informed and believe, and on that basis allege, that Yi was at all times relevant a resident of California.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

18.     Defendant James C. Peters ("Peters") was at all times relevant a member of Delivery Agent's Board of Directors and Delivery Agent's Chief Operating Officer beginning January 7, 2015.  Plaintiffs are informed and believe, and on that basis allege, that Peters was at all times relevant a resident of California.

19.     Defendant Souheil S. Badran ("Badran") was at all times relevant a member of Delivery Agent's Board of Directors.  Plaintiffs are informed and believe, and on that basis allege, that Badran was at all times relevant a resident of Wisconsin.

20.     Defendant David Cowan ("Cowan") was at all times relevant a partner at Bessemer Venture Partners.  Plaintiffs are informed and believe, and on that basis allege, that Cowan was at all times relevant a resident of California.

21.     Fitzsimmons, Lai, Power, Goettner, Borcher, Del, Yi, Peters, Badran, and Cowan are herein referred to collectively as "the Defendants."  Fitzsimmons, Power, Goettner, Borcher, Del, Yi, Peters, and Badran are at times referred to collectively as "the Director Defendants."

22.     The Defendants, because of their positions in and involvement with Delivery Agent, had the power and authority to control the content of any of Delivery Agent's securities offerings.  Because of their positions in Delivery Agent and their access to the facts recited in this Complaint, the Defendants knew that the securities offerings and related statements that are the subject of this Complaint contained material omissions of fact that were required to be disclosed and/or contained false and misleading statements.  The Defendants made or caused to be made those false or misleading statements and omissions.  The Defendants are thus liable for the omissions and false statements pleaded in this Complaint.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this matter pursuant to Section 27 of the Exchange Act and Section 1331 of Title 28, United States Code.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

24.     This Court has supplemental jurisdiction over the other claims asserted herein, pursuant to 28 U.S.C. § 1367.  Further, there is complete diversity and the amount in controversy

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

1    exceeds the jurisdictional amount, and thus this action is also subject to the Court's diversity

2    jurisdiction under 28 U.S.C § 1332.

3          25.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the

4    securities that are the subject of this lawsuit, and the alleged omissions of material fact, as well as

5    the false and misleading statements, were made in or issued from this District.  In addition, upon

6    information and belief, at least one Defendant is a resident in this District.

7          26.    A substantial part of the events and omissions giving rise to this action occurred in

8    San Francisco, California.  This action should therefore be assigned to the San Francisco Division

9    pursuant to Civil Local Rules 3-2(c) and (d).

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

11         27.    Delivery Agent is a "t-commerce," or television-commerce, company founded in

12   2005 that claimed to be able to connect TV viewers to the products they see on their smart

13   televisions.  The core of Delivery Agent's business was a purportedly proprietary technology that

14   allowed a TV viewer directly and immediately to purchase goods, such as an article of clothing

15   appearing in a TV commercial or worn by an actor in a TV show, using a smart television's remote

16   control, a mobile device, social media, or the Internet.

17         28.    From 2014 to 2016 Delivery Agent sold various types of securities to Plaintiffs and

18   other investors purportedly to raise funds in anticipation of an IPO.  Plaintiffs purchased Series F

19   Preferred Stock, Series G Preferred Stock, Stock Warrants, and Convertible Promissory Notes

20   (collectively, the "Securities") from Delivery Agent.

21         29.    Preferred stock is a security that gives the holder certain rights superior to those

22   who own common stock.  The Series F and Series G Preferred Stock sold by Delivery Agent to

23   Plaintiffs are securities.

24         30.    A Stock Warrant is a security that allows the holder of the warrant to buy stock of

25   the underlying company at a fixed price during a fixed time period.  The Stock Warrants sold by

26   Delivery Agent to Plaintiffs are securities.

27

28

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

31.     A Convertible Promissory Note is a debt instrument that is convertible into equity securities upon the occurrence of certain defined events.  The Convertible Promissory Notes sold by Delivery Agent to Plaintiffs are securities.

32.     Delivery Agent sold the Securities to Plaintiffs pursuant to Rule 506 of Regulation D of the Securities Act of 1933, which exempts certain securities from registration.  Securities offerings under Rule 506 are commonly referred to as "private placements."

33.     Plaintiffs purchased securities totaling approximately $17,000,000 as follows:

| Date | Security | RTI | RTII | Shares | Total |
|------|----------|-----|------|--------|-------|
| 9/24/14 | Series F Preferred Stock | $10,000,150 | | 11,009,578[1] | |
| 4/20/15 | Series G Preferred Stock | | $2,500,050 | 3,300,330[2] | |
| 7/21/15 | Convertible Note | | $3,500,000 | | |
| 3/30/16 | Convertible Notes | $651, 805 | | | |
| | | | | | $16,652,005 |

34.     All of the Securities were issued by Delivery Agent pursuant to a vote of the Board of Directors.

35.     The Series F Preferred Stock offerings were approved by a vote of Delivery Agent's Board of Directors on or about March 14, 2014.

36.     The Series G Preferred Stock, Warrants and Convertible Promissory Note offerings were approved by a vote of Delivery Agent's Board of Directors subsequent to the Series F Preferred Stock offerings.

---

[1] Included in RTI's purchase were three sets of Series F warrants totaling $150.

[2] Included in RTII's purchase was a Series G warrant for $50.

I.      **Plaintiffs' Introduction To Delivery Agent**

37.     In or about late 2013 and early 2014, Plaintiffs began considering an investment in Delivery Agent.  On January 12, 2014, Plaintiffs received from the Company a "Management Presentation" about the Company, dated September 13, 2013.  The presentation described Delivery Agent's "[p]roprietary, scalable technology platform" and its "proprietary data engine," stating that its "[p]roprietary platform enables consumers to buy through web, mobile, TV and social."  The Management Presentation stated that Delivery Agent allowed viewers to "[e]ngage with live TV programming and purchase directly from the TV screen."  The presentation also described Delivery's Agent's plans for a "pre-IPO" funding round to "fund operations and general corporate purposes" for "IPO readiness."   It touted Delivery Agent's "[h]ighly experienced management team, with strong history of innovation and industry leadership."

II.     **Before Plaintiffs' Initial Investment In Delivery Agent, The Company's First Major Test Run Failed Miserably, A Disaster That Management Covered Up**

38.     As Plaintiffs were assessing their initial investment in Delivery Agent, the Company was preparing for, and promoting, a high-profile, first-time test of its technology.  One of Delivery Agent's customers, H&M, had partnered with the Company to support a Super Bowl XLVIII commercial featuring international soccer star David Beckham's H&M clothing line.  H&M had purchased air time for a commercial during the game, and Delivery Agent's technology was supposed to allow viewers to purchase the advertised H&M clothing directly through their smart televisions.  Roughly 600 pieces of H&M merchandise had been reserved for the Delivery Agent test run.

39.     The Super Bowl advertising campaign for H&M was a critical test for the Company and received significant publicity in the weeks leading up to the Super Bowl.  The Company itself issued numerous statements promoting the Super Bowl campaign, lauding the interactive advertisement for H&M as a first-of-a-kind.  On January 6, 2014, the Company issued a press release proclaiming that the Super Bowl campaign would "change the course of the television advertising industry [because] H&M will utilize Delivery Agent's t-commerce platform to shop-enable their 30-second Super Bowl XLVIII ad featuring David Beckham."  The press

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

1   release further stated that "[c]onsumers tuned into Super Bowl XLVIII . . . will have the

2   opportunity to use their remote control to engage with the advertising content and opt-in to

3   purchase products as they view the new Spring collection of David Beckham Bodywear."  The

4   release explained that "H&M is the first retailer to launch a fully enabled t-commerce advertising

5   campaign."

6          40.     The press release specifically and repeatedly quoted Fitzsimmons.  He described

7   the H&M campaign as "a game-changer for the advertising industry . . . . With the upcoming

8   launch of the t-commerce-enabled H&M Super Bowl XLVIII ad, we are collectively redefining

9   the power and effectiveness of television advertising.  Years ago, the world talked about the

10  potential associated with buying Jennifer Aniston's sweater. H&M, in an industry first, will now

11  realize that potential by making their Super Bowl XLVIII ad *actionable and directly*

12  *measurable*." (Emphasis added.)

13         41.     Articles in Variety, on January 5, 2014, and AdAge, on January 6, 2014, described

14  how Delivery Agent's technology would appear in the televised Super Bowl commercial the

15  following month as a "technology first."  The articles further detailed how TV viewers would be

16  able to use their televisions' remote control to purchase items from David Beckham's clothing line

17  from H&M.

18         42.     Delivery Agent released another press release on January 31, 2014 again touting

19  the upcoming Super Bowl commercial for H&M.  Fitzsimmons is quoted in this press release

20  stating that the Super Bowl is "an important day for marketers to deliver and leverage their

21  investment in media in a meaningful way. [Delivery Agent's] part of the equation is to connect the

22  viewer with the products seen on TV and provide robust analytics that combine viewership data

23  with purchase data. We believe this Super Bowl will be a watershed event for the marketers we're

24  engaged with."  The press release further provided that the Super Bowl would involve "the launch

25  of the first fully enabled t-commerce advertising campaign powered by Delivery Agent."

26         43.     Delivery Agent's deployment of this important technology for the first time, during

27  such a high profile event, was clearly a significant moment for the Company.  The Company's

28  senior management closely monitored it in real time.  During and immediately after the

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

1   commercial aired, it became apparent to Delivery Agent that the campaign was a flop.  Most

2   viewers could not or did not make purchases using Delivery Agent's technology.  This important

3   and much publicized test of Delivery Agent's technology had failed spectacularly.

4        44.   As the high-profile test of the Company's technology and market feasibility

5   unraveled, Delivery Agent's senior management, including Fitzsimmons, the CEO and founder of

6   Delivery Agent, instructed Delivery Agent employees to purchase the H&M merchandise

7   themselves.  Within hours of the airing of the commercial, 585 of the 600 pieces of the H&M

8   merchandise available for sale through the Super Bowl campaign had been purchased by Delivery

9   Agent employees.

10       45.   Delivery Agent's deceit did not stop there.  Its officers, including Fitzsimmons, then

11  misrepresented the Super Bowl campaign as a success, including by affirmatively stating that the

12  purchases had been made by the general public and not by Delivery Agent employees.  Delivery

13  Agent's CEO and the then-current President and COO emailed H&M with news that Delivery

14  Agent had sold almost all of the merchandise within a very short period of time after the

15  commercial aired.  They made no mention of the fact that Delivery Agent's technology had failed

16  and that almost all of the merchandise had actually been bought by Delivery Agent personnel to

17  hide that failure.

18       46.   The Company also issued misleading statements to the public and potential

19  investors.  The day after the Super Bowl, on February 3, 2014, Delivery Agent published a press

20  release trumpeting the success of the Super Bowl commercial and its technology.  Despite the

21  debacle of the previous day, Fitzsimmons said that "H&M kicked-off a great campaign during

22  Super Bowl XLVIII to promote their David Beckham Bodywear Collection.  That same campaign

23  kicked-off a new paradigm for advertising, fundamentally changing the discipline by making

24  television advertising actionable and measurable."  The press release stated further that the "H&M

25  campaign is the first of its kind to leverage t-commerce technology to provide a mechanism for

26  viewers to engage and transact directly from a commercial."  These statements were false and

27  misleading.  The H&M Super Bowl advertisement was not a success – it had failed miserably.

28

47.     Not all of Delivery Agent's officers played along with the cover-up, however.  A few days after Super Bowl XLVIII, a whistleblower (the "Whistleblower") came forward to the Company's Auditor.  Among other things, the Whistleblower told the Auditor that:

  a. The Super Bowl H&M campaign had failed because TV viewers were unable to buy items from David Beckham's H&M clothing line through their TVs;

  b. Fitzsimmons directed high-ranking Delivery Agent officers to purchase the items featured in the TV commercial to give the appearance that Delivery Agent's technology had worked, when it had not; and

  c. False and fabricated sales reports touting the Super Bowl advertisement as a success were generated and disseminated to third-parties by Delivery Agent and its officers and directors.

48.     The Auditor subsequently informed Delivery Agent's Audit Committee of the allegations.

49.     The Audit Committee did not immediately address the issue, and the Company's management continued to proclaim to investors that Delivery Agent was a success, highlighting the supposedly positive H&M Super Bowl campaign as a key example.  On February 6, for example, a representative of Plaintiffs spoke with both Fitzsimmons and an investment banker for Delivery Agent to further explore a possible first investment in the Company.  Both Fitzsimmons and the banker described Delivery Agent as poised for success, including by way of an IPO planned for later that year, and referred specifically to the Super Bowl campaign as emblematic of that success.  The banker then provided, via interstate commerce, Plaintiffs' representative with an "Executive Summary of Delivery Agent" and a term sheet for the Series F investment, which Defendants had prepared, approved and/or authorized.  The Executive Summary described "[t]he Company's proprietary software" and stated that Delivery Agent was "planning to go public in April 2014" but was seeking a "pre-IPO round to fund its key growth initiatives," including "IPO readiness."  In his email, the banker also stressed that the Series F investment was Delivery Agent's "pre-IPO financing."

50.     Also on February 6, Delivery Agent sent Plaintiffs' representative the Business Section of Delivery Agent's draft Form S-1 (the "February 6, 2014 Draft S-1"),[3] which Defendants had prepared and/or approved for the Company's purportedly imminent IPO and to share with investors.  The February 6, 2014 S-1 included the false representation that "***during Super Bowl XLVIII viewers of H&M's Super Bowl ad featuring David Beckham, were able to buy the clothing featured in the ad directly from their remote control on an enabled TV.***"  (Emphasis added.)  The February 6, 2014 Draft S-1 also described Delivery Agent's technology as a "proprietary omni-screen technology platform" and an "integrated proprietary technology platform."  Indeed, Delivery Agent listed "[a]dvanced proprietary technology" as one of its "Competitive Strengths."  The February 6, 2014 Draft S-1 concluded, "Our solutions leverage proprietary technologies and data to enable real-time transactions, engagements and optimizations across devices and platforms."

51.     Between February 13 and February 22, 2014, Fitzsimmons spoke with Plaintiffs' representative another five times.  He again represented that the Company utilized proprietary technology that gave it an advantage in the market place.  He also described the Super Bowl commercial as a success, making no mention whatsoever of the technical issues encountered during that test run nor, of course, that the Company had engaged in a cover-up to hide the failure.  Fitzsimmons instead told Plaintiffs' representative that the financing sought by Delivery Agent was the final round of pre-IPO financing and was needed only to bridge a short-term negative cash flow in anticipation of the IPO.  The Company, he said, was on course for an IPO before the end of 2014.

52.     On February 20, 2014, Fitzsimmons shared another version of Delivery Agent's draft S-1 (the "February 20, 2014 Draft S-1"), which also was prepared and/or approved by the Defendants to be provided to investors.  The February 20, 2014 Draft S-1 again trumpeted the

---

[3] A Form S-1 is a filing with the U.S. Securities and Exchange Commission ("SEC") required of companies that intend to carry out an IPO.  Form S-1 is also known as the registration statement.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

Super Bowl Campaign as a success, stating that viewers "were able to buy the clothing featured in the ad directly from their remote control on an enabled TV."  It did not mention that the Super Bowl campaign for H&M had actually been a technical and market failure, nor that Defendants had engaged in a scheme to cover-up that failure.

53.     As these false and misleading statements were being disseminated, the Audit Committee of the Board – then comprised of Defendants Power, Goettner, and Borcher – was conducting an internal investigation into the Whistleblower's allegations.  The Audit Committee's investigation largely substantiated all of the allegations of the Whistleblower, finding that consumers had been unwilling or unable to purchase H&M merchandise through the Super Bowl commercial; Fitzsimmons had directed Delivery Agent personnel to purchase the merchandise in order to make the H&M commercial appear successful; and Delivery Agent officers had subsequently misrepresented that the merchandise had been purchased by consumers.  The Audit Committee shared its findings with the Auditor on or about March 14, 2014.

54.     The Series F closing materials – which were prepared, reviewed and/or approved by Defendants and sent in interstate commerce to Plaintiffs on or about March 18, 2014 – did not list any of these material issues in its Schedule of Exceptions.

### A.     The Auditor's Reaction to Delivery Agent's Investigation

55.     After delivering the results of the Audit Committee's investigation to the Auditor, the Board of Directors essentially whitewashed the failure of the Delivery Agent Super Bowl campaign for H&M and management's behavior, concluding that the cover-up was not material "from a financial standpoint."

56.     The Auditor rejected Defendants' attempt to gloss over a material breach of ethics by senior corporate officers.  In the Auditor's view, its ability to rely upon those officers was over, and with it the willingness of the Auditor to provide the accounting and auditing functions necessary to issue audit opinions in connection with an IPO also ended.  The Auditor concluded in writing that it was "not willing to rely on the representations" of Delivery Agent management involved in the Super Bowl debacle "for purposes of [the Auditor's] previously-completed audit" of Delivery Agent's consolidated financial statements.

57.     The Auditor further informed Delivery Agent that it would not be able to reissue its previously issued audit report or continue with the December 31, 2013 audit it was then conducting if the persons involved in fabricating data also were involved with accounting, or internal controls, or assumed any financial role at Delivery Agent, even if they were merely in a position to influence those in such roles.

58.     The Auditor also informed Delivery Agent that to complete its audit for the year ended December 31, 2013, it would need to significantly expand the scope of its previously completed 2012 audit and the incomplete 2013 audit to determine if any Delivery Agent personnel inappropriately influenced the accounting or financial reporting.

59.     Defendant Power, the Chairman of the Audit Committee, discussed the Auditor's position with the Auditor.  After that discussion, it was apparent that the Auditor would not roll over and adopt the conclusions of Delivery Agent's own investigation.

60.     The response of the Board of Directors was unanimous.  It terminated the Auditor on July 29, 2014.  Delivery Agent formally dismissed the Auditor as its independent auditor on August 4, 2014.

61.     The obvious consequence of the termination of the Auditor was that Delivery Agent could not complete an IPO.  By terminating the Auditor, Delivery Agent triggered an obligation under the federal securities laws for the company to explain the circumstances and bases for terminating the Auditor.  That explanation, known as Item 304 of Regulation S-K, is required of all companies that intend to go public.  Under Item 304, Delivery Agent would be obligated to disclose to the SEC and all potential IPO investors that its Super Bowl campaign for H&M had failed, that senior management then engaged in a cover-up, and that the Auditor had refused to continue working with the Company because it did not believe senior management could be trusted to provide reliable financial reporting.  Even worse for Delivery Agent, the law governing Item 304 disclosures requires that the company request a letter from the dismissed auditor stating its agreement or disagreement with the Item 304 disclosure, which itself would be filed as an exhibit to its filings.  Both Item 304 and the Auditor's response are reviewed by the SEC prior to an IPO.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

62.     All of the foregoing facts were material to any reasonable investor engaged in making a decision to invest or not invest in Delivery Agent.

63.     The Defendants either directly concealed from Plaintiffs these facts or participated in encouraging the additional investments in Delivery Agent knowing that these facts were being concealed.

64.     Had Plaintiffs known that the Super Bowl demonstration was a failure, that the Auditor had been terminated because it refused to go along with the fraud and declined to accept the representations of managers who participated in it, or had Plaintiffs learned that these circumstances effectively eliminated any possibility of an IPO, Plaintiffs would never have purchased the Securities.

**B.     Even As It Feuded With The Auditor, Defendants Continued To Solicit Investments With Misleading Statements About Delivery Agent's Past Success And Future Potential**

65.     As Delivery Agent's spat with its Auditor over the implications of the failed Super Bowl campaign boiled over in the summer of 2014 – culminating in the Company's firing of the Auditor on July 29, 2014 – Defendants continued to solicit Plaintiffs' investment in the Company by way of misleading and false statements.

66.     Plaintiffs' representative met repeatedly with Defendants Cowan and Borcher in March and April 2014 to discuss investing in Delivery Agent.  Both individuals represented one of the largest investors in Delivery Agent.  Borcher had been appointed by Cowan's investment firm to represent that investor on the Board and served on the Board's Audit Committee, while Cowan himself was intimately involved in the Company's affairs and frequently attended Board Meetings, even though, on information and belief, he had no formal position at Delivery Agent.  Each was heavily involved in recruiting additional investments as the Company burned through capital in 2014.

67.     Borcher, as a member of the Audit Committee, knew about the Super Bowl fiasco in March and April 2014.  Cowan, in addition to receiving updates from Borcher, attended numerous Board meetings himself as a major investor in the Company.  Yet each provided glowing reports about the Company to Plaintiffs' representative – Cowan during phone calls on

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

March 12 and April 14, 2014, and Borcher in a call on June 11, 2014.  During these conversations, Cowan and Borcher encouraged further investment by Plaintiffs.  Both repeatedly assured Plaintiffs that Delivery Agent's IPO was imminent and that the Series F financing round was just the final round of private fundraising needed by the Company to reach IPO.

68.     These representations were false and misleading.  Cowan and Borcher both knew of the disastrous H&M Super Bowl commercial test run, as well as management's subsequent cover-up and the escalating dispute with the Auditor.  This information would be material to any investor.  By June 2014, both also knew that an IPO was almost certainly impossible in light of the Auditor's position and the coming Item 304.  But an IPO is precisely what they promised Plaintiffs, and soon.

69.     On or about May 12, 2014, Defendants also prepared and disseminated or caused to be disseminated in interstate commerce certain written materials to Plaintiffs and others.  Among those written materials was a PowerPoint (the "PowerPoint") presentation describing Delivery Agent and its technology.

70.     Despite the spectacular failure of the H&M Super Bowl campaign three months earlier, the PowerPoint prominently featured portions of the AdAge and Variety articles that had been published in January 2014, which had described how Delivery Agent's technology would appear in a televised Super Bowl commercial the following month.  The PowerPoint also again explicitly linked Delivery Agent's desire to raise capital to preparing for the impending IPO. Under the heading "Capital Raise," the PowerPoint said that "Delivery Agent is seeking to raise $35 million in a pre-IPO round to fund its key growth initiatives."  Under the heading "Use of Proceeds," Delivery Agent listed the first item as "IPO readiness."

71.     On or about June 18, 2014, Defendants prepared and/or approved yet another draft S-1 statement and disseminated or caused a portion of it to be disseminated in interstate commerce to potential investors, including to Plaintiffs (the "June 2014 Draft S-1").  The June 2014 Draft S-1 says, among other things, that Delivery Agent's "technology and relationships enable viewers to engage with, and transact in response to television content anytime, anywhere and on any connected device."

72.     Defendants claimed in the June 2014 Draft S-1 that through Delivery Agent's "end-to-end engagement and commerce solution, we handle the entire transaction process for our partners on a white-label basis, enabling viewers to . . . purchase products seen on TV shows, sporting events, commercials and infomercials." In 2013, Delivery Agent's technology "drove more than 75 million viewer engagements with products and information from our partners' content."

73.     The June 2014 Draft S-1 goes on to identify five examples of "how viewers interact and engage with television content" through Delivery Agent's "platform." The first example was still the February 2014 Super Bowl campaign with H&M, stating that "during Super Bowl XLVIII, viewers of H&M's Super Bowl advertisement featuring David Beckham *were able to buy the clothing featured in the advertisement directly from their remote control on enabled TV's.*" (Emphasis added).

74.     In several places throughout the PowerPoint and the June 2014 Draft S-1, Defendants claimed that Delivery Agent's technology was proprietary. For example, the June 2014 Draft S-1 described Delivery Agent's technology as its "proprietary omni-screen technology platform" and an "integrated proprietary technology platform." Delivery Agent even listed "[a]dvanced proprietary technology" as one of its "Competitive Strengths" in the June 2014 Draft S-1. The June 2014 Draft S-1 further says, "Our solutions leverage proprietary technologies and data to enable real-time transactions, engagements and optimizations across devices and platforms." These statements were false and/or misleading because Defendants knew that the Delivery Agent technology did not function properly, as illustrated by the Super Bowl failure, and also that the technology was not in any meaningful sense proprietary.

75.     In a Management Presentation also dated July 18, 2014, which was provided to Plaintiffs and other investors and prepared, approved or authorized by Defendants, the Super Bowl campaign continued to be lauded as a complete success. The Presentation stated that Delivery Agent had "*[l]aunched first shopping-enabled Super Bowl ad with H&M via Samsung Smart TVs,*" which had "*[r]einforced 1st mover advantage through 2014 Super Bowl campaign with*

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

1   ***H&M.***" (Emphasis added.) The Management Presentation also described Delivery Agent's

2   "[p]roprietary data engine" as a "[f]ully-tested, proprietary tech platform."

3       76.     With Plaintiffs still unaware of the problems plaguing Delivery Agent, including

4   that the Board had just fired the Auditor, on August 11, 2014 Fitzsimmons exchanged emails with

5   Plaintiffs' representative regarding investment by Plaintiffs in the Company.  Plaintiffs'

6   representative noted that the date for the Delivery Agent IPO had changed from July 2014 to

7   September 2014, and that it looked like that date would be pushed back even further.  He asked

8   Fitzsimmons:  "What is reason for this change and management's outlook for IPO in the future?"

9   In response, Fitzsimmons wrote, "We made a significant acquisition at the end of Q'2 (Music

10  Today).  This was fully vetted with both Credit Suisse and Deutsche Bank who jointly advised the

11  company to fully integrate and execute at least one quarter as a merged entity before going

12  public."  Fitzsimmons then encouraged another investment by Plaintiffs in the Company, claiming

13  that Plaintiffs would have "2.0X upside protection in IPO."

14      77.     These statements were false and misleading because the true reason for the delay in

15  the purported IPO was the failure of the H&M Super Bowl campaign, the failure of Delivery

16  Agent's technology, and the Company's dispute with and subsequent firing of the Auditor.

17  Fitzsimmons knew these statements were false and misleading, and intended that Plaintiffs would

18  rely on them.

19      78.     On August 25, 2014, Defendants provided Plaintiffs with the next Series F

20  financing closing documents.  Included in these materials was Exhibit F, the Schedule of

21  Exceptions, which this time noted only one thing:  "The Company is in the process of changing

22  accountants from [the Auditor] to Grant Thornton."

23      79.     In stating that Delivery Agent was merely "changing" accountants, the Schedule of

24  Exceptions was materially misleading because it failed to disclose that the Auditor had determined

25  that Company senior management was unreliable and refused to remain as auditor unless

26  management was terminated, and that the Company had fired the Auditor as a result.  Nor did it

27  disclose that, as a result of the change in auditor, the Company would have to disclose before any

28  IPO the real reason for the change, including that the H&M Super Bowl campaign had failed, that

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

management tried to hide that failure, and that the Auditor would file a response to the Item 304 explaining its concerns with the Company's management team and Board as a result of the Super Bowl campaign malfeasance. Defendants' failure to note any of this in the September 2014 Series F closing documents is a glaring omission of information that would be material to any reasonable investor.

80. In reliance on the above misrepresentations and misleading omissions, on September 24, 2014 Plaintiff RTI invested $10,000,150 in Delivery Agent by purchasing Series F preferred shares. RTI would not have made this investment had it known that the Super Bowl campaign failed; that senior members of the Delivery Agent management were involved in creating fake sales reports about the campaign to hide the failure; that the Auditor therefore had lost all trust and faith in Delivery Agent's senior management; that Delivery Agent's Board had fired the Auditor when it refused to go along with the Company's whitewash of the Super Bowl ad campaign failure and cover-up; and that the Auditor's firing meant that an IPO almost certainly could not take place. RTI also would not have invested had it known that Delivery Agent's technology neither worked nor was proprietary. But due to Defendant's misleading statements, Plaintiffs had now invested over $10 million in a company that, unbeknownst to Plaintiffs, was in dire straits with no hope of the promised "imminent" IPO.

C.    **Still More Misleading Statements Caused Plaintiffs To Make Further Investments.**

81. On January 9, 2015, the Defendants disseminated or caused to be disseminated through interstate commerce to Delivery Agent investors an updated draft S-1 that continued to include the same statement falsely indicating that the February 2014 Super Bowl H&M advertising test run was a success.

82. In March 2015, around the date Defendants had represented in October 2014 that the Company would go public, Plaintiffs first learned of a "304 issue." Even then, Defendants did not disclose the central, material facts. On March 10, 2015, Plaintiffs' representative sent an email to Defendant Power, chair of the Audit Committee, asking why there had been a delay in obtaining the 2012 and 2013 audits needed for the IPO and what else could delay the IPO. In

response, Power stated "The main delay driver was the treatment of the revenue on a gross versus net basis.  Since [Grant Thornton] was taking a position that was counter to that taken by [the Auditor], they spent additional time within [Grant Thornton] to run it all the way up their chain of command."

83.    With respect to any further delays in the IPO, Power wrote that "I believe you are now up to speed on the 304 issue with [the Auditor] that we are currently working through – there is definite risk on that front but we are actively working it.  He added that "[w]e are currently on pace to receive the reports for all three years by the end of March which is in line with the current late June IPO timeline."

84.    Power had mentioned the "304 issue" to Plaintiffs shortly before this email, but he misrepresented its nature.  Power told Plaintiffs that the Item 304 related to certain internal financial control issues the Auditor had identified in connection with the Company's former CFO.  Power led Plaintiffs to believe that while the Company would need to file an Item 304, the issue was minor and would be easily resolved.  Neither Power nor any other Defendant disclosed the Super Bowl campaign failure, its cover-up, and the Auditor's complete lack of faith in management.

85.    Rather than make a complete and full disclosure of the Super Bowl advertising failure and subsequent cover-up, Delivery Agent and the Defendants solicited new funding through the sale of securities to Plaintiffs by falsely and fraudulently continuing to claim that Delivery Agent's IPO was imminent.

86.    On or about March 11, 2015, Delivery Agent released an investor update entitled "Q1 2015 Mid Q Investor Update" (the "March 2015 Investor Update").  The March 2015 Investor Update noted that the "IPO process [was] progressing with continued audit delays" but it did not disclose the nature or severity of those "audit delays."  The March 2015 Investor Update then identified a "Need to solve immediate cash issue."  It went on to say that Delivery Agent was raising $12 million in "Pre-IPO Bridge" funds.

87.    On or about March 18, 2015 Plaintiffs' representative met with Defendant Borcher, who informed him that Delivery Agent was still going to IPO but needed further short-term bridge

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

1   financing to reach the delayed IPO.  Borcher did not provide the full reasons for the delay in

2   proceeding with the IPO, or that an IPO likely would never be possible as a result of the

3   Company's actions during and after the Super Bowl campaign.

4           88.     Kept in the dark regarding the true (and devastating) nature of the "304 issue," RTII

5   invested $2,500,050 in Delivery Agent's Series G Preferred Stock on April 20, 2015.

6           89.     Plaintiffs' representative – now a Board member – repeatedly sought more

7   information regarding the "304 issue" over the summer of 2015.  At an April 28, 2015 Board

8   meeting, Plaintiffs' representative requested a copy of the Draft Item 304 language being prepared

9   for the still "imminent" IPO.  Fitzsimmons, with the other Defendants present, told Plaintiffs'

10   representative that the language was being kept confidential and that he would receive it in due

11   course.  He also informed Plaintiffs' representative that, in any event, the Draft Item 304 language

12   was immaterial to the financial statements of the Company.  Plaintiffs' representative followed up

13   with email requests for a copy of the Draft Item 304 language on May 8 and May 11, but again

14   was rebuffed.

15           90.     Meanwhile, Defendants solicited even more funding over the summer of 2015.  On

16   June 24, 2015, Defendants represented to Plaintiffs' representative that Delivery Agent faced a

17   severe cash shortage and that insiders like Plaintiffs needed to provide still more short-term bridge

18   financing for the Company to survive until its IPO.

19           91.     In response to this request, and in reliance upon Defendants' continued assurance

20   that the Company's technology worked and that an IPO or acquisition was imminent, RTII

21   invested another $3,500,000 in Delivery Agent via a convertible note on July 21, 2015.

22   Defendants knew their representations and assurances were false and intended Plaintiffs to rely

23   upon them in deciding to invest again in the supposedly short-term IPO bridge financing.

24           92.     On the same day that RTII made its final investment – July 21, 2015 – Plaintiffs

25   finally received the Company's draft Item 304 language.  The Company's language, prepared

26   and/or approved by Defendants, downplayed the Super Bowl advertising campaign failure and

27   subsequent acts by senior management to cover-up the failure.  The draft Item 304 said, in relevant

28   part, only the following:

a.  In February 2014, in connection with an interactive advertising campaign involving [Delivery Agent's] technology, certain current and former employees, and members of our senior management (including our current Chief Executive Officer, our current President of eCommerce and our former head of interactive advertising) instructed other employees to purchase, or make purchases themselves, of merchandise that was offered for sale online as part of the interactive advertising campaign on behalf of our advertising campaign partner.  These purchases involved merchandise owned by and held in inventory of the Company, were in the amount of less than $10,000, had no financial impact, and were never recorded in the Company's books and records.

b.  In addition, within two business days, it was determined that some of the Company's current and former employees and members of our senior management also prepared information, or were involved in or aware of the preparation of information, that contained fabricated data regarding the performance of the advertising campaign, including regarding the sales of merchandise during the campaign.  The fabricated data was provided to one of our advertising campaign partners and certain other third parties.  When our Chief Executive Officer learned that the data had been fabricated, he retracted it from all recipients and instructed them that the data should not be relied upon for any purposes.  The Company believes that the data was not relied upon by its advertising campaign partner or any third party, and the Company maintains an ongoing business relationship with this advertising campaign partner.

93.  The Company sent the Draft Item 304 to the Auditor for its response.  In an email dated August 5, 2015, Fitzsimmons claimed that Delivery Agent would be able to file for an IPO as soon as August 12th, "[a]ssuming [the Auditor] plays along . . . ."

94.  But the Auditor did not play along.  On August 16, 2015, Fitzsimmons told Plaintiffs' representative that the Auditor's response to the Item 304 was a "major setback" that may render Delivery Agent "unmarketable."  Despite this email, Plaintiffs did not actually receive the Auditor's draft response from the Company until August 21, 2015.  The Auditor's draft response to Delivery Agent's Draft Item 304 filing was highly critical of Delivery Agent's portrayal of the record and its omission of several key facts.  It provided far more information, describing an intentional effort by Delivery Agent's most senior officers to conceal a catastrophic failure of Delivery Agent's core technology, an effort to falsify and fabricate data to make that failure appear like a success, and repeated attempts by Fitzsimmons to obstruct the internal and external investigations into the Super Bowl fiasco.

95.  The Auditor's draft response also made clear that several high-ranking corporate officers purchased the vast majority of the items advertised during the Super Bowl and did so to

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

conceal the fact that Delivery Agent's technology had failed and that TV viewers were unable to

buy nearly any of the advertised items:

> In February 2014, in connection with the first interactive advertising campaign to market merchandise offered for sale online on behalf of one of the Company's advertising partners on super bowl Sunday, certain current and former employees of the Company, and certain members of the Company's senior management (including the current Chief Executive Officer (CEO), the Company's current President of eCommerce and the Company's former head of interactive advertising), instructed other employees of the Company to purchase, or made purchases themselves, of 585 of 600 pieces of the advertising partners' merchandise that was offered for sale as part of the campaign. After receiving an update that only 15 pieces of merchandise had been purchased hours into the super bowl, the current CEO directed the former President and COO to 'buy all remaining' merchandise.

> Further, the CEO received an email during super bowl Sunday indicating the advertising partners' representatives tried but could not access technology to purchase their merchandise. The next day, the Chief Executive Officer agreed to have the former President and COO email the advertising partner that they sold out of all 1,100 pieces of merchandise (600 pieces of merchandise offered for sale and 500 pieces of the same merchandise available for giveaway). The same day, the CEO emailed the Board communicating purchases of 711 pieces of their advertising partners' merchandise (which unknown to the Board included the 585 of 600 merchandise pieces bought by employees directed to do so by the CEO and other members of Senior Management and 139 of 500 merchandise pieces available for the giveaway). Two days after the advertising campaign, the CEO gave an update at a Board meeting communicating the advertising campaign was a great success with no discussion of the technology problems encountered or the 585 of 600 pieces sold being acquired by Company personnel at the CEO's direction.

96.     Upon information and belief, Defendant Lai is the "the former President and COO" referenced in the Auditor's response above. Lai is also referred to as the "current President of eCommerce" in the Draft Item 304.

97.     The Auditor's response established that Fitzsimmons personally directed other employees to make the purchases, that Fitzsimmons knew that the subsequent sales reports were false, that the fabricated data was provided to an advertising partner, and that there was no evidence that the fabricated data was withdrawn after it was disseminated:

> We disagree with the implication in the third sentence in the fourth paragraph where the Company's disclosure states that 'When our Chief Executive Officer was advised that some of the data had been fabricated[,]' as he would have known that data was fabricated in that it would either include employee purchases he directed or included purchases to the advertising partner, Board of Directors and later a potential investor or have required alteration to remove the effect of these and he was made aware of the technology issues from the advertising partner. As previously noted, subsequent to the conclusion of the campaign the Chief Executive Officer reported to the Board that the campaign was a success, no

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

1   mention of him directing employees to make purchases or the inability of

2   advertising partners and some employees to access technology to purchase
    merchandise was mentioned.

3   Further, we understand that the Audit Committee's external investigation team later

4   obtained evidence indicating that the CEO and others in Senior Management
    directed the metrics to be altered further as 361 of 500 free units offered in the

5   campaign were not given away and sent the altered metrics to the advertiser and
    potential investors. It was subsequently determined that some of the Company's

6   current and former employees and certain members of the Company's senior
    management had prepared, or were aware of the preparation of, information that

7   contained fabricated data regarding the performance of the above-referenced
    interactive advertising campaign, including fabricated data regarding the amount of

8   merchandise purchased during the campaign. The fabricated data was provided to
    the advertising campaign partner and to certain other third parties at the direction of

9   the Chief Executive Officer and others in Senior Management. Days after the
    campaign, the CEO sent a potential investor the same report sent to the advertising

10  partner originally and stated 'campaign massive success and is leading to an
    extension[.]'

11  We disagree with the statement that 'When our Chief Executive Officer was

12  advised that some of the data had been fabricated, the data was promptly retracted
    from the recipients[.]' The investigation found no evidence that such data was

13  retracted and our Partner was told such had not been prior to our termination. We
    have no basis to agree or disagree as to what has been communicated since our

14  termination, or whether the fabricated data was relied upon by its advertising
    campaign partner or any third party or if the Company maintains an ongoing

15  business relationship with this advertising campaign partner. We were told that
    the investigation found that at the time of the advertising campaign the CEO and

16  members of Senior Management's actions demonstrated that the success of the
    super bowl Sunday advertising campaign from a technological feasibility

17  perspective was very important to the Board, advertising campaign partners and
    potential investors at that time.

18      98.    The Auditor went on to explain that the Draft Item 304 omitted that Fitzsimmons

19  improperly interfered with Delivery Agent's internal and external investigations into the Super

20  Bowl matter:

21  The allegation of fabricated data was brought to the attention of [the Auditor] by an
    employee in senior management, and we in turn informed the Audit Committee

22  Chairman. Omitted from the Disclosure in fifth paragraph is that, the Audit
    Committee investigated the matter, initially using internal resources however, the

23  internal investigation team experienced repeated interference from the Chief
    Executive Officer. Despite clear communication from the Audit committee of who

24  was responsible for the investigation, the Chief Executive Officer wanted certain
    individuals not to be a part of the internal investigation team, tried to influence the

25  scope of the investigation and caused there to be delays in conducting email and
    other electronic searches.

26
    Subsequently, the Audit Committee engaged an outside law firm to conduct an

27  independent investigation and prepare a report to the Audit Committee regarding its
    findings. The scope of the Audit Committee's investigation was (a) to investigate

28  management's actions and conduct during the advertising campaign, and also

24
**COMPLAINT**

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

specifically (b) to investigate allegations of interference with the audit committee's internal investigation by the Chief Executive Officer and Senior management. Based upon the external investigation team, we understand that the Audit Committee concluded that (a) the Chief Executive Officer acknowledged his involvement in the purchase of products by employees along with other members of Senior Management. While there was evidence indicating the Chief Executive Officer's involvement in further manipulation of data provided to advertising partners and others to make the employee purchases appear as though they had come from customers the Audit Committee believes such was inconclusive.

However, the Audit Committee believed conclusive evidence indicated that certain members of senior management and employees were found to have knowledge and involvement in the further manipulation of the advertising data beyond the purchase of products and initial reporting of those purchases and (iv) The Chief Executive Officer made repeated attempts to influence the scope and composition of the Audit Committee's original internal investigation prior to the Audit Committee engaging an external investigation team and we were informed the CEO even tried to influence the scope with the external investigation team.

99.     Had RTII known of the full scope of Delivery Agent's actions during the H&M Super Bowl campaign, the failure of that test run, the subsequent cover-up and the resulting dispute with the Auditor, it would not have invested its money.  Defendants made misleading statements that concealed this information, or knowingly misrepresented the facts, and intended that Plaintiffs would rely upon such statements, which Plaintiffs did.

## III.   Plaintiff RTI Makes One Final, Specific Investment Based Upon Continued Misrepresentations And In An Attempt To Salvage The Company.

100.    In late 2015 and early 2016, Defendants represented that the Company needed more cash to survive as management was seeking to sell Delivery Agent or even still launch an IPO, which if successful could have salvaged Plaintiffs' investments.  To keep the Company afloat as it looked for an exit and to protect the amounts already invested, Plaintiff RTI purchased a $651,805 convertible note from Delivery Agent on March 30, 2016.

101.    But the Auditor never softened the substance of its response to Delivery Agent's draft Item 304.  As a direct and proximate result, the probability of an IPO was zero.  Delivery Agent also retained investment bankers to broker a sale of Delivery Agent.  This exit plan failed as well because, as Plaintiffs were shocked to learn, there were no buyers for Delivery Agent since the Company had no meaningful intellectual property or ongoing valuable business.

102.    Because it had been revealed that Defendants had misled investors who had previously provided Delivery Agent with capital to meet its burn rate, no additional investment occurred and Delivery Agent ran out of cash to operate the business.

103.    On September 15, 2016, Delivery Agent filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

104.    Plaintiffs' $17 million investment in the Securities is now worthless.

## IV.    Defendant's Omissions And Misrepresentations Caused Plaintiffs To Lose The Entire Value Of Their Investments

105.    Plaintiffs' loss was caused by the misleading statements and omissions made by Defendants.  The truth about the Super Bowl campaign, Delivery Agent's management's actions in the campaign and afterwards, the cover-up and dispute with the Auditor, and finally the lack of any significantly proprietary or otherwise valuable technology rendered Delivery Agent essentially worthless, causing Plaintiffs to lose the entire value of their investment.

## V.    No Safe Harbor

106.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and omissions pleaded in this Complaint because those statements and omissions are factual and relate to events in the past rather than forward-looking events.

107.    None of the statements alleged herein are "forward-looking" statements and no such statement was identified as "forward looking" when it was made.

108.    In the alternative, to the extent that the statutory safe harbor does apply, the Defendants are still liable under federal securities laws for any forward-looking statements because the speaker actually knew that the forward-looking statement was false, misleading, or omitted facts necessary to make statements previously made not materially false or misleading.

### FIRST CAUSE OF ACTION
#### (For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)

109.    Plaintiffs incorporate ¶¶ 1 through 108 by reference.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

110.    This Count is asserted against all Defendants pursuant to Section 10b of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated by the SEC under 17 C.F.R. § 240.10b-5.

111.    Defendants employed devices, schemes, and artifices to defraud.

112.    Defendants failed to disclose material facts specified above that they had a duty to disclose.

113.    Defendants made or approved the false and misleading statements specified above, which they knew were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Delivery Agent and its IPO prospects, as described herein.

115.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly and recklessly and for the purpose and effect of concealing negative information about Delivery Agent, including that it could not go public, as described herein.

116.    Plaintiffs would not have purchased the Securities if they had been aware of the material information omitted by Defendants and/or known the truth about the false and misleading statements made by Defendants.

117.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in that the actions that were the subject of Defendants' omissions and false statements ensured that Delivery Agent could not go public and that Delivery Agent would have no value to a prospective buyer.

118.   Plaintiffs have suffered damages in that they paid $16,652.005 million for the Securities that are now worthless.

119.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of the Securities.

## SECOND CAUSE OF ACTION

### (For Violation of § 20(a) of the Exchange Act
### Against All Defendants)

120.   Plaintiffs incorporate ¶¶ 1 through 119 by reference.

121.   This Count is brought against the Defendants pursuant to Section 20(a) of the Exchange Act.

122.   The Defendants exercised their power and authority to engage in the wrongful acts alleged herein.  The Defendants were "controlling persons" of Delivery Agent within the meaning of Section 20(a) of the Exchange Act.  In that capacity, they participated in the unlawful conduct alleged that caused Plaintiffs the damages alleged herein.  Each of the Defendants, therefore, acted as a controlling person of Delivery Agent.

123.    By virtue of their high-level positions, their participation in and/or awareness of Delivery Agent's operations, and their ability to influence and control Delivery Agent's operations and business, including securities offerings, the Defendants had the ability and authority to influence and control, and did influence and control, directly and indirectly, decision-making at Delivery Agent, including the content of and dissemination of materials containing the statements and omissions described herein in connection with the offer for sale and sale of the Securities.

124.   Because of their senior positions at Delivery Agent and/or their direct personal involvement in the matters described in the Complaint, Defendants had knowledge of the material omissions of fact and false representations described in this Complaint before they were disseminated to Plaintiffs and others.

125.   As Delivery Agent's officers and/or directors, the Defendants had a duty to disseminate accurate and truthful information with respect to Delivery Agent's business and affairs.

126.    By reason of their positions as senior management and/or directors of Delivery Agent, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Delivery Agent to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Delivery Agent and possessed the power to control the specific activities, which comprise the primary violations described in the Complaint.

### THIRD CAUSE OF ACTION
### (Fraud – Intentional Misrepresentation Or Omission)

127.    Plaintiffs incorporate ¶¶ 1 through 126 by reference.

128.    This Count is asserted against all Defendants.

129.    Defendants made or approved the false and misleading statements specified above, which they knew were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly and recklessly and for the purpose and effect of concealing negative information about Delivery Agent, including that it could not go public, as described herein.

131.    Defendants intended for Plaintiffs to rely on the false and misleading statements in investing in Delivery Agent.  Plaintiffs reasonably relied on the misrepresentations and/or misleading statements by Defendants, since Plaintiffs as investors are entitled to rely on the representations of persons offering the sale of securities.  Plaintiffs, moreover, developed a professional relationship with Defendants and reasonably believed that Defendants' statements regarding the Company would be truthful and accurate.

132.    Plaintiffs would not have purchased the Securities if they had been aware of the material information omitted by Defendants and/or known the truth about the false and misleading

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

statements made by Defendants. Plaintiffs' reliance on Defendants' misrepresentations and/or misleading statements about the Company was a substantial factor in causing them harm.

133. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in that the actions that were the subject of Defendants' omissions and false statements ensured that Delivery Agent could not go public and that Delivery Agent would have no value to a prospective buyer.

134. Plaintiffs have suffered damages in that it paid $16,652,005 for the Securities which are now worthless.

135. The aforementioned conduct of Defendants was malicious, fraudulent, and oppressive within the meaning of California Civil Code § 3294 and was undertaken with the intention on the part of Defendants to deprive Plaintiffs of property, money, and/or legal rights and constitutes conduct that is despicable, subjecting Plaintiffs to a cruel and unjust hardship in conscious disregard to their rights, so as to justify an award of exemplary and punitive damages according to proof.

136. This action was filed within three years of discovery of the fraud.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

137. Plaintiffs incorporate ¶¶ 1 through 136 by reference.

138. Defendants made or approved the false and misleading statements specified above, in which they lacked reasonable grounds in believing the statements to be true.

139. Plaintiffs would not have purchased the Securities if they had been aware of the material information omitted by Defendants and/or known the truth about the false and misleading statements made by Defendants.

140. As a direct and proximate cause of Defendants' negligent conduct, Plaintiffs suffered damages in that the actions that were the subject of Defendants' omissions and false statements ensured that Delivery Agent could not go public and that Delivery Agent would have no value to a prospective buyer.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663

141.    Plaintiffs have suffered damages in that it paid $16,652,005 for the Securities which are now worthless.

142.    This action was filed within three years of discovery of the negligent misrepresentations.

**WHEREFORE**, Plaintiff respectfully demands judgment in its favor and against Defendants as follows:

A.  Awarding plaintiff damages, including interest, in an amount to be determined at trial;

B.   Punitive damages in an amount to be determined at trial;

C.  Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

DATED: March 8, 2017                    COBLENTZ PATCH DUFFY & BASS LLP


                                        By:    _____/s/ Rees F. Morgan_____
                                               Rees F. Morgan
                                               Attorneys for Plaintiffs
                                               Rising Tide I, LLC; Rising Tide II, LLC

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 • Fax 415.989.1663